I'd like to reserve two minutes for rebuttal please. Thank you. Good morning and may it please the court. Alexander Jacobs for Sukhjivan Singh Minhas. I'd like to begin today by discussing some key elements of documentary evidence in this case. The reason I'd like to begin there is because only by discounting this documentary evidence is a finding that the petitioner did not experience harm rising to the level of past persecution possible. Both the immigration judge's decision and the BIA's decision state that they gave little weight to the documentary evidence, the affidavits of Petitioner's parents, and the medical and psychological evaluation reports. However, neither decision addresses the document's contents at all or their relevance to the Petitioner's ability to meet his burden of proof, but only why they were discredited. And discrediting the contents of the medical and psyche evals are particularly significant because they clearly demonstrate the continued physical and psychological harm, which demonstrates that the harm rose to the level of past persecution. So in the case of the affidavits by Petitioner's parents, it was legally erroneous to discredit these documents because neither opinion explained why the similar wording and style of the documents should affect the weight afforded to them. Kagan, besides which, the wording wasn't all that similar. I didn't find it to be. It was more the style of writing. They were prepared by the same Indian attorney. Obviously, they were written by the same person, but yes. Okay. Go ahead. Sure. Thank you, Your Honor. Additionally, lack of detail in supporting documents is no basis for discounting their contents. If the immigration judge found that these documents did not provide sufficient detail, they should have provided Petitioner with an opportunity to obtain more detailed supporting letters. But let me ask you this. Even if you assume that's so and that the affidavits of the parents should be credited, doesn't it ultimately come down to whether or not he can safely relocate in India? Your Honor, I think that is an issue that could — that is an issue I'd be happy to discuss. I think that there's plenty of evidence in the record, including substantial country conditions submitted by a Ph.D. expert that did a very specific analysis of Petitioner's risk of relocation that does support that he would have a well-funded career. Explain that to me. I don't understand it. The Congress Party is no longer in power. I understand there's a history that goes back a long time ago. I understand that. But we're talking about today, in the 2018, soon-to-be-2019. I'd like to really get a comfort level that he cannot find a place to live in India. It's a huge country. Yes, Your Honor. As of the time that the hearing was conducted, the Ph.D. expert submitted evidence that high-ranking police officials in India have been in their positions for a long time, that many high-ranking officials retain deep party — Throughout the entire country? Yes, Your Honor. Well, I — this is something I don't understand. I thought that the problem here was that he was found not to have had past persecution. Yes, Your Honor. And if he does have past persecution, then the burden shifts on the — on the relocation. Yes, Your Honor. So essentially, if we decide that he has past persecution, the relocation finding that's in there is not — is not a valid one, and we have to go back. Exactly. That's our position. Thus, the only way that we believe that one could find that he did not suffer past persecution is by discounting the ample medical and psychological reports. Am I correct in understanding that his parents still live in New Delhi? They do. And they — and the father was the one that was really the one who precipitated this problem in terms of railing against the persecutions that happened in that Yes, Your Honor. Petitioner testified credibly, and his father's affidavit also matches this issue, that when the Petitioner first intervened on behalf of his father at the attack in, I believe it was January of 2011, at that point, the Congress Party members declared that they were making it — anything that the father had done would be taken out on the son. And so Petitioner and his father both claimed that it seemed from that and the continued The father's okay, but the son's at risk. That's your position. That is our understanding from the record, yes, because the father has gotten very old, and both the India country conditions expert and the Petitioner and father all allege that it's very common practice for a Congress Party to do something like that, such as targeting a member of a family of someone who has gotten older. They're not even in power anymore. Yes, Your Honor, I understand. And as I — as I stated, I believe that the country conditions evidence we submitted and the detailed, individualized analysis of his well-founded fear support our position. But if the Court does agree with me that he did experience past persecution, then I believe that would no longer be our burden to prove, and we would — we would need to — Right now. I mean, you'd have to go back, and they'd have the burden, but it wouldn't end the case, but it would. Yes. So based on the medical and psychological evaluation reports, as I — I'm not sure if I started saying this yet. Discrediting them would be legal — was legally erroneous because both the immigration judge and the BIA failed to explain their assertion that they provided inadequate foundation for their conclusions. The basis for the conclusions are clearly set forth on the face of the documents. The medical report indicates that he conducted a physical examination and interview during which he determined that he continues to suffer pain consistent with the beatings that he described. He also mentioned psychological symptoms. And then the psychologist report — the psychological report indicates what practice he did to come to a diagnosis. He came — he began with an in-person evaluation to determine if he suffers any recognized conditions, details his past trauma. And then the diagnosis he reaches, the method that he describes for reaching his diagnosis is consistent with what the DSM-5 would — would recommend in reaching a diagnosis of post-traumatic stress. What about the question of whether the physician's affidavit is conflicting with the testimony? I understand that he wasn't specifically asked whether he still had pain, but he did testify that he fully recovered because — from the injuries. I believe what the testimony states is that he was able to recover within two to three weeks enough to return to work. I do not believe that there's anywhere in the record that reflects that he was fully recovered. Oh, you said it took me about two or three weeks to fully recover because of the injuries. That was his testimony. Yes, Your Honor. My mistake. I — I believe that a reasonable fact-finder could have understood that to be fully recovered enough to — Oh, yes, but the question is whether a reasonable fact-finder could have found the opposite, could have believed — could have regarded that as a statement that he wasn't in any pain anymore. I understand that. Perhaps this is a good time to reserve for rebuttal. Thank you. Thank you. May it please the Court. John Holt for the Attorney General. It's always a privilege. Page 125 of the record specifically states the testimony of Petitioner that he had fully recovered. I already said that, didn't I? Go ahead. Page 125 of the record. Yes, on page 125. Substantial evidence support the agency's decision denying Petitioner's application for asylum, withholding removal, a cat, and also giving little — little evidence to documentary evidence when the agency specifically identified deficiencies in those documents. Well, what about the parents' affidavits? So I don't understand the basis for discounting them. The immigration judge in the ward — I know what he said. But first of all, they're not similarly worded particularly. The awkwardness of the language may be similar, but I compared paragraph to paragraph and they were really quite different. And besides which, if you look in any Federal district court record, you're going to see a whole lot of declarations that look pretty similar because they're usually drafted by a lawyer or a paralegal, and then somebody reads them over and signs them. Does that make them invalid? We would respectfully invite the Court to compare paragraphs 12 through 16 and 20 through 21 of the father's affidavit on page 237 through 242 and paragraphs 11 through 15 and 18 through 19 of the mother's affidavit appearing at 244 through 48. You're right. They're not substantially similar. They are verbatim. Word for word. And a lot of them are not at all similar. And so to say that they're not substantially similar is a — But first of all, they're similar in part and dissimilar in other parts. And second of all, is that a standard? I mean, given the fact that we know that these people don't speak English and did not themselves write this language here, why does that say anything about whether what's in it that they subscribe to? That is believable or not. Well, before the FactFinder, we have affidavits. Sometimes at a trial, we have testimony. If a judge is faced with testimony of witnesses that is verbatim, we would respectfully submit that that invites special scrutiny. And that's what the immigration judge was faced with here. The immigration judge not only identified that the affidavits were substantially similar in their verbatim, but secondly, the immigration judge identified deficiencies in the affidavits that were problematic for him. So they didn't say what they didn't say. So therefore, there weren't going to be evidence about what they didn't say. But why aren't there evidences as to what they did say? Well, it's a matter of weight to be given to the evidence. And the immigration judge identified three deficiencies. They didn't explain why the CP, the Congress party, would be interested in Petitioner as he had been out of the country for two years. They didn't explain why the family had remained in India unharmed. And they didn't state why Petitioner alone would be the subject of persecution in light of the father last being attacked in 2011. I thought they did explain that. You can either agree with it or not agree with it, but they did explain it. They specifically said that they weren't attacking the father because the father was old and they were instead going to go after the son. They didn't address either the mother or the daughter. And we would submit that the fact finder, the immigration judge, was entitled to consider all the testimony and he considered those deficiencies. What's critical is, is the immigration judge, with regard to the affidavits, considered the affidavits and he considered it as evidence. Petitioner admits on page 4 of her reply brief that the evidence was admitted. This is not a case where the judge excluded evidence. He didn't discount it completely. He just gave it less weight. That's right on the mark. This is not a case of no weight. And Petitioner overstates the case before this Court, asking this Court to reweigh the evidence, which this Court never does. It looks at for substantial evidence when evidence is considered. And that's really the linchpin with respect to the documentary evidence. Well, I don't understand how what weight did he give it. I mean, this essentially, the parents each tell us very specific stories which indicate that the testimony was true and he found it wasn't true, so he didn't give it anyway. The judge specifically stated that he gave it weight. Well, what weight did he give it? He said he didn't find that it was helpful and the board said on the board. So he gave it no weight. No. Not helpful is no — doesn't say that it's no weight. But he didn't believe anything in it. Well, what we're talking about is — He said everything in it isn't true. That certainly sounds like no weight. The judge never said that everything in the affidavit isn't true. He said everything that the individual testified to wasn't true, and it was consistent with the affidavit in many details. The judge said that there was — it was not helpful to Petitioner to carry his burden to establish, by preponderance of the evidence, entitlement to asylum, withholding removal, or protection under CAT. This Court faces all the time fact-finders that present their findings of fact to the So let's assume that there's past persecution here. What would be your position then? Do you get to the relocation issue at all, or does that have to be remanded? Well, we would submit that that conclusion would be fatally flawed in light of the fact-finders' specific findings of no persecution, and I'd like to address that. But the — No, but I want you to go beyond that. Let's assume — I'll go beyond that. I agree with you. We find that past persecution has been established. Just hypothetically, what would be your position then? We would say that there have been changed country conditions, and so the presumption has been overcome. Well, but whatever it is, we'd have to remand at that point. That's correct. We'd have to remand in that situation. That's correct. That's right. But let's go — the issue of past persecution is a fact-specific inquiry. Petitioner argued absolutely no facts regarding the incidents that occurred. And in terms of evaluating past persecution, let's look at, first of all, action and then impact and then words. What were the actions? In January 2011, Petitioner was attacked when he came to the aid of his father. He was kicked in the stomach, knocked to the ground. That was the actions in January 2011. In December 2012, he was hit by a baton or with sticks. What was the impact? With regard to the December 2012, he never testified anything at all about it had any impact on him at all. With regard to the January 2011 incident, again, page 125 of the record, and that's really the most important factual site in this record regarding the past persecution, he states that he was fully recovered. So if we look at the words and the actions and the impact, we see this is not a case of past persecution. So if we look at the words — excuse me, if we look at the actions, now we go to the words. The words Petitioner stated at page 122 of the record that he — the four hooligans or thugs, as the immigration judge identified these CP members that attacked Petitioner, that they told him that they would punish him. No threats were communicated directly to Petitioner other than they would punish him. Their threats were communicated to Petitioner's father. Petitioner's father communicated the threats that were given to him to his son. On page 126 and 240, the father admits that — the father's testimony is that the threats were made to him regarding his son. So if we look at the threats, what's critical is that the agency determined they were indirect, they weren't significant, they didn't result in any particular harm. So neither the actions nor the words, either what happened to Petitioner nor his — nor the words amount to past persecution. And there's — I think the — probably the legal significant point of this whole case is the substantial evidence test. by the immigration judge and the agency of no past persecution. With no past persecution, there's no presumption of future persecution. Kagan, I'd like to get back to something you said earlier, and I'm sorry. Which paragraphs did you say were verbatim in the two affidavits? Paragraphs 12 through 16 of the father's affidavit, if you compare that with paragraphs 11 through 15. Excuse me. I just did, but they're not exactly the same. Excuse me, Your Honor. Not every word — not every word in the entire paragraph, but sentences in those paragraphs are verbatim. Oh, I see. Okay. Excuse me. Thank you. With regard to the other documentary evidence, I'll go there quickly. And again, the Court's faced with two issues, one in terms of the merits, whether the facts establish past persecution, well-founded fear, a cat claim, but then also the process issue, whether the documentary evidence was not properly considered. So we — let's look at Dr. Lee's report. Dr. Lee's report is really a curious document. The immigration judge said it was one of the oddest documents he'd ever seen. Facially on the document, it appears to be a repetition of the asylum claim. It doesn't establish any medical tests were run. And most importantly, it is inconsistent with Petitioner's testimony. Again, Petitioner stated that he had fully recovered, and the board said that the board's reason, because there was no pain, the document was inconsistent with Petitioner's testimony, who said there was no lasting injury. Kagan. Can anybody ask him at the — at the hearing, say, this document says you had pain? Did you have pain? Or how come you said you fully recovered when this document says you had pain, or anything? Was there any examination at the hearing about what was in the affidavit, what was in the medical affidavit?  And as a matter of fact, that's the point that the agency focused on. He never stated that he faced a permanent injury. They asked him whether he was still in pain. They asked him that? No, they didn't. They asked him whether he had an injury. And basically, the question is, if there is no injury, then that's evidence that there is no pain. That's the point. They asked him whether he still had an injury? That's correct. And he — page 125 is the critical testimony about that he had no injury. In summary, the evidence was properly considered. There's no issue of process. And in terms of the merits, substantial evidence supports the agency's denial of the applications and petition. We ask the Court to deny the petition for review. Thank you, Your Honors. Thank you very much. So in the discussion of past persecution that we were just having, fixating on whether or not there was a lasting injury seems to me fairly inconsistent with what is required to show past persecution, the fact that there — whether or not there is a lasting injury. Was he, in fact, discussed or cross-examined or anything about the injury? I mean, I'm — I'm on page 125. I didn't. And it says, how long did you stay home after the attack? It took me two or three weeks to fully recover because of the injuries. But nobody said to him, are you still in pain or anything like that? That's correct, Your Honor. That's my understanding as well. Or do you still have an injury or anything like that? No. I don't believe that he was asked either on direct or on cross-examination about the nature of his injuries. And at any rate, whether or not he was severely harmed at this time, the significant death threats against him — I'm sorry.   If you count the physical pain issue, there is still ample evidence in the record that he has significant psychological trauma based on the past persecution he experienced. And if the immigration judge found that there was an inconsistency as to his — the state of his physical pain, he should have been provided a reasonable opportunity to explain if that was one of the bases on which this denial was focused. And as to identifying the deficiencies in the record, in the — in the documentary evidence, both decisions merely identify their deficiencies and give no weight at all to any of their contents. If the immigration judge found their lack of detail to be a cause for deficiency, he also should have been provided an opportunity to obtain more detailed documents. So, aside from the two incidents, he said that there were stones thrown at his house. And then the — what else should he say happened? So, the past persecution analysis, we believe, should include both the 1984 attacks on his father, on their neighborhood, the vandalizing of the house, also the two — It's a bit of a stretch since he was an infant, but go ahead. Not if it was directly related. If the harm to family was directly related to the subsequent harm to the petitioner, I believe that the case law supports that being included in the analysis. Okay. But go ahead. Go ahead now. Okay. So, it's the 1984 attacks and the ravaging of the neighborhood. There is the first initial attack, physical attack, on the petitioner where he intervenes in his father's defense. There is the ongoing stones being thrown at the house. And what about threats? What were the threats? So, at the time of the first physical attack, the — those who were attacking his father said that they were now going to take things out on the son. And then again, in August of 2012, the Congress Party supporters explicitly told Petitioner's father that they were going to kill his son. And then again, in December of 2012, the Congress Party supporters, armed with a knife, actively and concretely attempted to carry out that threat. They attacked the petitioner and told him there was no way they were going to leave him alive. So that was, in fact, a direct threat made to him and not to the — to the father. And the fact that he was able to escape with his life and flee does not undermine that they tried very hard to do so. Okay. Thank you very much. The — thank you both for your useful arguments. Meanhouse v. Whitaker is submitted, and we'll go to United States v. Carter.
judges: Gould, Berzon, Block